IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTECH DIAGNOSTICS, INC.      :

      :

   v.      :  Civil Action No. DKC 13-0068

      :

MORWALK, INC., et al.      :

      :

**MEMORANDUM OPINION**

Presently pending and ready for review in this breach of contract dispute are the motion to dismiss filed by Defendants Wendy Walker, D.V.M., and Morwalk, Inc. (ECF No. 11), and several motions to seal (ECF Nos. 5, 13, & 14). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons set forth below, all pending motions will be denied.

**I.  Background**

    **A.  Factual Background**

The following facts are alleged in the first amended complaint. (ECF No. 8). Plaintiff Antech Diagnostics, Inc. ("Antech"), is a California corporation that maintains its principal place of business in Los Angeles, California. Defendant Morwalk, Inc., doing business as Town & Country Animal Clinic ("Morwalk" or "Town & Country"), is a Maryland corporation that operates an animal hospital in Olney, Maryland.

Defendant Wendy Walker, D.V.M., is a citizen of Maryland and a Morwalk shareholder.

In January 2010, Antech and Dr. Walker, "as president of Town & Country," signed a Lab Services Agreement ("the 2009 LSA"). (ECF No. 8 ¶ 6).[1] Antech alleges that, pursuant to the 2009 LSA, Morwalk agreed to use Antech "exclusively to provide laboratory services in an amount equal to [a] minimum of [$7,000] per month for twenty-four (24) months." (*Id.*). Antech, in turn, agreed to pay Town & Country a monthly rebate "equal to a percentage of the total qualified services" for which it paid Antech each month. (*Id.*).

In early 2011, prior to the expiration of the 2009 LSA, Walker allegedly approached Antech for a loan to fund the purchase of new laboratory equipment. Antech agreed to provide the loan in exchange for a new Lab Services Agreement ("the 2011 LSA") pursuant to which Antech both "reduced the monthly minimum require[d] services expected from Walker and/or Town & Country" and "continued to provide the benefits of the 2009 LSA." (ECF No. 8 ¶ 10).

The first page of the 2011 LSA states as follows:

> This Services Agreement (this "**Agreement**") is entered into by and between Antech Diagnostics ("**Antech**") and the party or

---

[1] No party has submitted a copy of the 2009 LSA.

parties listed below as "**Animal Hospital Owner(s)**" as of the Effective Date (defined below). This Agreement shall consist of this cover page, the attached terms and conditions and all annexes and attachments referred to below.

(ECF No. 11-1, at 1) (emphases in original).[2] Immediately below

that, under the heading "SUMMARY," the following appears:

| **Antech:** | **Antech Diagnostics** |
| Address: | 17672 Cowan Avenue |
| | Irvine, California 92614 |
| Facsimile: | 800 783 8695 |

| **Animal Hospital:** | **Town and Country Animal Clinic** |
| **Owner(s):** | Dr[.] Wendy Walker |
| Address: | 2715 Olney Sandy Springs Rd[.] |
| | Olney, MD 20832 |
| | 301 774 7111 |

(*Id.*) (emphases in original). Also under the heading "SUMMARY,"

the 2011 LSA states that the "Term of Agreement" is sixty (60)

months and that its effective date was March 1, 2010. (*Id.*).

Antech alleges, however, that the reference to 2010 was a

typographical error and that "the parties understood the

effective date of the 2011 LSA was March 1, 2011." (ECF No. 8

¶ 8). The cover page also contains the following provisions:

**MINIMUM AVERAGE ANNUAL FEE:** Animal Hospital Owner is required to utilize Antech to

---

[2] Because Antech expressly relies on the 2011 LSA in its amended complaint and because Antech has not raised any challenge to the authenticity of the version of the contract submitted by Defendants (ECF No. 11-1), the 2011 LSA is appropriately considered in ruling on Defendants' Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222-23 (4th Cir. 2009).

provide Laboratory Services required by Animal Hospital in an amount equal to a minimum of $300,000 or $5,000 net per month (the **"Minimum Average Annual Fee"**), in accordance with the provisions of Section 1 below.

**LOYALTY COMMITMENT** As an incentive to enter into this Agreement, Antech will rebate to Animal Hospital Owner a monthly amount as outlined in Annex #2 (the "**Loyalty Rebate**"). The Loyalty Rebate will be subject to the terms and conditions set forth in Section 3.

(ECF No. 11-1, at 1) (emphases in original).

The 2011 LSA requires the Animal Hospital Owner to "cause all veterinary diagnostic and clinical laboratory services ('**Laboratory Services**') that are to be performed for and on behalf of the Animal Hospital, to be performed by a veterinary diagnostic laboratory owned by Antech (an '**Antech Lab**')." (*Id.* § 1.1) ("the Exclusivity Provision"). The 2011 LSA establishes three exceptions to the Exclusivity Provision. First, Section 1.1.1 allows the Animal Hospital Owner to cause its Laboratory Services to be performed by a non-Antech laboratory so long as:

the fees paid to such other entity in the aggregate during each 'Contract Year' (i.e., each twelve month period beginning on the date or anniversary date of this Agreement) are less than 10% of all fees paid by or on behalf of the Animal Hospital in connection with all Laboratory Services during that Contract Year.

Second, Section 1.1.2 permits the Animal Hospital to use a non-Antech laboratory "to perform any services that a[n] Antech Lab

cannot perform." Third, Section 1.1.3 provides that the Animal Hospital "may use laboratory equipment owned by the Animal Hospital Owner and located at the Animal Hospital premises."

In Section 3.1, titled "Terms of Rebate," the 2011 LSA states that "[a]s long as Animal Hospital Owner meets the minimum monthly volume (see **Minimum Average Annual Fee**), Antech will credit the Animal Hospital's monthly lab invoice with the rebate as set forth in Annex 2 for the term of the agreement." (ECF No. 11-1 § 3.1). Annex 2 specifies the amount of the monthly rebate. (*See id.* at 6).

In Section 3.2, titled "Default," the 2011 LSA establishes that two types of events constitute an "event of default with respect to the Rebate": (1) a breach of the Exclusivity Provision; and (2) a failure to pay invoices within thirty (30) days of receipt from Antech. (ECF No. 11-1, § 3.2). Section 3.2 goes on to state:

> At any time after the occurrence of an event of default, Antech may declare the entire amount of the Rebates previously paid to be billable and due immediately; NOTE HOWEVER, if the Animal Hospital Owner lab volume during any month falls below the stated rebate threshold in, [*sic*] the rebate will not be apply [*sic*] to that month BUT that does not constitute default as long as the exclusivity provisions set forth in Section 1 are maintained.

(*Id.*). The 2011 LSA also contains a confidentiality clause and a California choice of law provision. (*See id.* §§ 4 & 6). On

the fourth page of the 2011 LSA, under the heading "ANIMAL HOSPITAL OWNER," is the signature of Wendy J. Walker. (ECF No. 11-1, at 4). Underneath that signature is a line titled "By:" which is completed with the handwritten, printed name of "Wendy J. Walker." The line titled "Its:" is blank.

Antech alleges that, on or about December 3, 2011, "Walker and/or Town & Country entered into a service agreement with IDEXX Laboratories, Inc. ('IDEXX'), one of Antech's competitors, in breach of their contractual obligation to use Antech's laboratory services exclusively." (ECF No. 8 ¶ 12). Antech further alleges that, since that date, "Walker and/or Town & Country have utilized IDEXX's services to the complete exclusion of Antech." (*Id.*).

### B.  Procedural Background

On January 7, 2013, Antech filed a complaint against Walker and "Town & Country Animal Clinic, Inc." (ECF No. 1). On February 21, Dr. Walker moved to dismiss, arguing that (1) she is not a proper Defendant because she is not a party to the 2011 LSA in her individual capacity; (2) the complaint failed to state a claim; and (3) the complaint contained a misnomer and failed to name Morwalk, a necessary party. (*See* ECF Nos. 4 & 4-1). On February 26, Antech filed a motion to seal Dr. Walker's motion to dismiss and all supporting memoranda and exhibits. (ECF No. 5).

Antech then filed an amended complaint, which replaced the entity "Town & Country Animal Clinic, Inc." with Morwalk and mooted Dr. Walker's first motion to dismiss. (ECF Nos. 7 & 8). In its amended complaint, Antech alleges that Dr. Walker or Morwalk knowingly breached the 2011 LSA in two ways: (1) "by failing to exclusively utilize Antech's veterinary laboratory services in the amount agreed upon of $60,000.00 per year through the completion of the five-year term" and (2) by utilizing IDEXX's services "to the complete exclusion of Antech." (ECF No. 8 ¶¶ 16, 21). Antech asserts that, as a result of these breaches, it has suffered damages in the form of lost profits and unreturned rebates of $175,222.94. (*Id.* ¶¶ 17, 22).

On April 19, 2013, Dr. Walker and Morwalk filed a motion to dismiss the first amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) (ECF No. 11), a memorandum in support thereof (ECF No. 12), and a consent motion to seal the foregoing (ECF No. 13). On May 6, Antech filed its opposition to Defendants' motion (ECF No. 15), along with a motion to seal (ECF No. 14). Neither Defendant filed a reply.

## II. Motion to Dismiss

### A. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of*

*Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v.*

*Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B.  Analysis**

Defendants raise three arguments in their motion. (ECF No. 12, at 1-4). First, Defendants argue that Dr. Walker is not properly named in her individual capacity. Second, Defendants argue that the amended complaint lacks sufficient factual allegations to establish the plausibility that the Exclusivity Provision has been violated. Third, Defendants contend that the 2011 LSA requires only that the contracting party use $300,000 worth of Laboratory Services performed by Antech over the entirety of the contract's five-year term, meaning that there can be no breach based on the volume of services used until the contract expires. Each of these arguments will be addressed, in turn.

1. **The Complaint States a Plausible Basis for Holding Dr. Walker Liable in Her Individual Capacity.**

Defendants' sole argument in support of dismissing Dr. Walker is that the amended complaint affirmatively alleges that Dr. Walker signed the contract in her capacity "as president." (ECF No. 12 ¶¶ 2-4). As Antech observes in its opposition (ECF No. 15), however, this argument mischaracterizes the allegations of the amended complaint.[3] The only reference in the amended complaint to Dr. Walker acting in her capacity "as president of Town & Country" is in connection with the 2009 LSA (*see generally* ECF No. 8) – which is not the contract upon which Antech sues.

By contrast, the amended complaint states a plausible basis for holding Dr. Walker liable in her individual capacity for the alleged breaches of the 2011 LSA. First, the amended complaint itself does not specify whether Dr. Walker signed the 2011 LSA in her individual capacity or on behalf of Town & Country but instead asserts that "Walker *and/or* Town & Country" were bound

---

[3] In its opposition, Antech also argues that Defendants' motion to dismiss is untimely to the extent it is submitted on behalf of Dr. Walker. (ECF No. 15, at 3). According to Antech, Dr. Walker was served with its amended complaint on March 13, 2013, *via* the CM-ECF system. Antech contends that, pursuant to Fed.R.Civ.P. 15(a)(3), Dr. Walker had fourteen (14) days to respond, yet did not file her motion to dismiss until April 19, 2013, more than a month later. Antech's untimeliness argument need not be considered because, as discussed below, Dr. Walker's motion to dismiss will be denied on its merits.

by the agreement. (ECF No. 8 ¶¶ 8-9) (emphasis added). Second, the express provisions of the 2011 LSA contradict Defendants' position. The cover page to the 2011 LSA indicates that the contract is "entered into by and between Antech Diagnostics ("**Antech**") and the party or parties lasted below as "**Animal Hospital Owner(s)**." (ECF No. 11-1, at 1). Later on the same page, the "**Animal Hospital**" is identified as "**Town and Country Animal Clinic**" and the "**Owner(s)**" as "Dr[.] Wendy Walker." Later, Dr. Walker's signature appears beneath the designation "**ANIMAL HOSPITAL OWNER**" followed by "By: Wendy Walker" and "Its:_____." (*Id.* at 4). In addition, the 2011 LSA also sets forth different obligations for the "Animal Hospital" and the "Animal Hospital Owner." (*Compare, e.g.*, *id.* § 1.1.1 *with* § 1.1.2).

Construing the allegations in Antech's favor, and in light of the 2011 LSA's repeated references to the "Animal Hospital Owner" as a contracting party, the amended complaint plausibly states a basis for holding Dr. Walker liable in her individual capacity. *See, e.g.*, *Antech Diagnostics, Inc. v. Downers Grove Animal Hosp. & Bird Clinic, P.C.*, No. 12-C-2736, 2012 WL 2567045, at *3-4 (N.D.Ill. June 29, 2012) (in a case involving a similarly worded exclusivity contract for Laboratory Services provided by Antech, declining to dismiss the individual

veterinarian defendants identified as "Owner(s)" on the cover page of the contract).[4]

### 2. The Amended Complaint Alleges a Plausible Claim for Breach of the Exclusivity Provision in the 2011 LSA.

Defendants next contend that Antech's amended complaint fails to state a plausible claim for breach of the Exclusivity Provision because the 2011 LSA permits the use of non-Antech laboratories in certain circumstances. (ECF No. 12 ¶¶ 11-16). Thus, according to Defendants, Antech needed to allege explicitly that none of the exceptions to the Exclusivity Provision could possibly apply in order to state a breach claim.

Defendants' position is unavailing because the allegations of the amended complaint, when taken as true and construed in the light most favorable to Antech, establish the plausibility that the exceptions to the Exclusivity Provision do not apply.

---

[4] Judge Bredar's decision granting summary judgment in favor of an individual defendant in *VCA Cenvet, Inc. v. Chadwell Animal Hospital, LLC*, No. JKB-11-1763, 2011 WL 6257190, at *3 (D.Md. Nov. 29, 2011), does not demand a different result. *Chadwell* involved a similarly worded exclusivity contract for Laboratory Services provided by Antech. *See id.* at *1-2. Judge Bredar concluded that the contract was facially ambiguous as to whether it bound the veterinarian who was designated as the "Owner" on the cover page in his individual capacity. Judge Bredar's finding of ambiguity was based primarily on the final page of the contract at issue, where the veterinarian's signature was followed by "By: Keith Gold" *and* "Its: President." *Id*. at *3. Here, by contrast, the "Its:" line is blank. Moreover, even if the 2011 LSA were deemed ambiguous as to the identity of the parties to be bound, that conclusion would not require dismissing Dr. Walker at this stage.

12

Specifically, the amended complaint alleges that, beginning in December 2011 and continuing until at least March 2013, "Walker and/or Town & Country have utilized IDEXX's services to the *complete* exclusion of Antech." (ECF No. 8 ¶ 12) (emphasis added). In other words, Antech alleges that Dr. Walker and/or Town & Country have directed 100% of their Laboratory Services to IDEXX and 0% to Antech. If Antech is able to substantiate these allegations, the first exception to the Exclusivity Provision – which permits the use of a non-Antech laboratory for Laboratory Services so long as the fees for such services are less than 10% of the Animal Hospital's total expenditures for Laboratory Services in a given year – clearly would not apply.

Antech's allegations also establish the plausibility that the second exception – which permits the use of a non-Antech laboratory to perform "any services that a[n] Antech Lab cannot perform" – is inapplicable. Although the amended complaint does not explicitly aver that Defendants have used IDEXX to perform services that can be performed by an Antech Lab, that is the most reasonable inference that can be drawn from the facts alleged. First, Antech asserts that, pursuant to the 2011 LSA, Antech "continued to provide the benefits of the 2009 LSA," *i.e.*, a monthly rebate in an amount "equal to a percentage of the total qualified services for which Town & Country utilized Antech each month." (ECF No. 8 ¶¶ 6, 10). Antech had no

obligation to pay such rebates unless Dr. Walker and/or Morwalk were, in fact, using Antech's Laboratory Services in accordance with the Exclusivity Provision. Antech also alleges that, in December 2011, Walker and/or Town & Country signed a services agreement with IDEXX, which is characterized as "one of Antech's competitors." (*Id.* ¶ 12). Finally, Antech alleges that "[s]ince [early December 2011] Walker and/or Town & Country have utilized IDEXX's services to the complete exclusion of Antech." (*Id.*). Defendants would apparently have the court conclude that their needs for Laboratory Services changed so completely and abruptly in December 2011 that Antech could no longer perform any such services, even while IDEXX, Antech's competitor, could. Although possible, the more plausible inference is that Defendants' exclusive use of IDEXX's services encompassed at least some Laboratory Services that could be performed (and had previously been performed) by Antech Labs.

Accordingly, because it can reasonably be inferred from Antech's allegations that the first two exceptions to the Exclusivity Provision do not apply, and because Defendants make no arguments relating to the third exception, the amended complaint states a plausible claim for breach of the 2011 LSA's Exclusivity Provision.

**3. The Amended Complaint Also States a Plausible Breach of Contract Claim Based on Defendants' Alleged Failure to Cause At Least $5,000 Worth of Laboratory Services to be Performed by Antech Per Month.**

Defendants' final argument is that the 2011 LSA does not require any monthly minimum payment but instead requires only a total payment of $300,000 over the five-year term of the contract. (ECF No. 12, at 4). Thus, according to Defendants, there can be no breach based on insufficient payments until after the 2011 LSA expires. (*Id.*). Antech maintains that its breach of contract claims are ripe. (ECF No. 15, at 5-6). Antech has the better argument.

The parties agree that the 2011 LSA is to be interpreted according to California law. In California, "[t]he fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties," as of the time of contract formation. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18 (1995) (internal quotation marks omitted). Where possible, such intent is to be inferred "solely from the written provisions of the contract," according to their "clear and explicit meaning." *Id.* (internal quotation marks omitted). Only where the plain terms of a contract are ambiguous – *i.e.*, where the terms are susceptible to more than one reasonable construction – may extrinsic evidence of the parties' intent be considered. *Benach*

*v. Cnty. of Los Angeles*, 149 Cal.App.4[th] 836, 847 (2007).
Determining whether contract language is ambiguous is a question
of law. *Producers Daily Delivery Co. v. Sentry Ins. Co.*, 41
Cal.3d 903, 904 (1986). In making that determination, the
contract's provisions must be interpreted together as a whole
"so as to give effect to every part, if reasonably practicable,
each clause helping to interpret the other." Cal. Civ. Code
§ 1641.

Here, when the 2011 LSA is considered as a whole,
Defendants' proposed interpretation is unavailing. Section 3.2
of the agreement provides that "if the Animal Hospital Owner lab
volume during any month falls below the stated rebate threshold
in, [*sic*] the rebate will not be apply [*sic*] to that month BUT
that does not constitute default *as long as the exclusivity
provisions set forth in Section 1 are maintained*." (ECF No. 11-
1 § 3.2) (emphasis added). This provision unambiguously
establishes that a drop below $5,000 in monthly Laboratory
Services volume constitutes a breach where there is a
simultaneous breach of the Exclusivity Provision. Because, as
discussed above, Antech asserts a plausible claim for breach of
the Exclusivity Provision, the amended complaint also states a
claim based on Defendants' alleged failure to cause at least
$5,000 worth of Laboratory Services to be performed by Antech in

any month since December 2011.  Accordingly, Defendants' motion
to dismiss must be denied.

## III. Motions to Seal

The parties also seek to seal the 2011 LSA and each of the
briefs quoting provisions of the contract.  (ECF Nos. 5, 13, &
14).  In support of their requests, the parties rely primarily
on the confidentiality provision in the 2011 LSA, which bars the
Animal Hospital Owner from publishing (or causing to be
published) the contract's existence, terms, or pricing
information without Antech's consent and "except as required by
law or judicial process."  (ECF No. 11-1 § 4).  Antech also
submits a declaration from Brian Brown, its Assistant
Controller, who conclusorily avers that the 2011 LSA is
confidential and that its disclosure to a competitor "could
cause Antech competitive harm or put that competitor at an
unfair advantage."  (ECF No. 5-2, Brown Decl. ¶¶ 3-4).  As
discussed below, neither of these justifications warrant sealing
of the documents in question.

"The right of public access to documents or materials
filed in a district court derives from two independent sources:
the common law and the First Amendment." *Va. Dep't of State
Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004), *cert.
denied*, 544 U.S. 949 (2005).  "The common law presumes a right
of the public to inspect and copy 'all judicial records and

documents.'" *Id.* at 575 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)). This presumption can be overcome only if "countervailing interests heavily outweigh the public interests in access." *Id.* (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-99 (1978). The First Amendment provides a "more rigorous" right of access for certain "judicial records and documents," *Va. Dep't of State Police*, 386 F.3d at 575-76, which may be overcome "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest," *Stone*, 855 F.2d at 180.

As a substantive matter, when a district court is presented with a request to seal, it must determine two things: (1) whether the documents in question are "judicial records" to which the common law presumption of access applies; and (2) whether the documents are also protected by the more rigorous First Amendment right of access. *See In re Application of United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013). The Fourth Circuit recently held that judicially authored or created documents are "judicial records," as are documents filed with the court that "play a role in the adjudicative process, or adjudicate substantive rights." *Id.* (citing *Rushford*, 846 F.2d at 252; *In*

*re Policy Mgt. Sys. Corp.*, 67 F.3d 296 (4th Cir. 1995) (unpublished table decision)).

The sealing of any judicial records must also comport with certain procedural requirements. First, the non-moving party must be provided with notice of the request to seal and an opportunity to object. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). In addition, "less drastic alternatives to sealing" must be considered. *Va. Dep't of State Police*, 386 F.3d at 576. Finally, if sealing is ordered, such an order "must state the reasons (and specific supporting findings)" for sealing and why sealing is preferable over alternatives. *Id.; cf*. Local Rule 105.11 (requiring any motion to seal to include both "proposed reasons supported by specific factual representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protection").

Applying these principles here, it must first be determined whether the documents the parties seek to seal are judicial records, as recently defined by the Fourth Circuit. The 2011 LSA forms the basis for this breach of contract action and thus necessarily plays a role in adjudicating the substantive rights of the parties, as illustrated by the their extensive citations to the contract in briefing Defendants' motion to dismiss. Accordingly, the 2011 LSA and any references thereto are

judicial records to which the common law right of public access attaches. To justify sealing, therefore, the parties must – at a minimum – establish a significant countervailing interest that outweighs the public's interest in openness.[5]

The parties fail to meet their burden. First, with respect to their reliance on the confidentiality provision in the 2011 LSA, it is well-established that "parties cannot by agreement overcome the public's right of access to judicial records." *Cochran v. Volvo Grp. N. Am., LLC*, --- F.Supp.2d ---, No. 1:11-CV-927, 2013 WL 784502, at *4 (M.D.N.C. Mar. 1, 2013); *see also Bureau of Nat'l Affairs v. Chase*, No. ELH-11-1641, 2012 WL 3065352, at *3 (D.Md. July 25, 2012) ("[p]rivate parties are entitled to enter into confidential agreements, but the courts ordinarily are not party to such promises of confidentiality . . ."). Second, Antech's assertions of harm are unconvincing and are unsupported by any specific factual details regarding the purported competitive disadvantage that the company would face upon unsealing the 2011 LSA. Nor is it clear how the agreement's terms are truly "confidential," given that similarly worded exclusivity contracts have been publicly filed in other lawsuits involving Antech and have been discussed

---

[5] Because, as discussed below, the parties fail to establish such an interest, it need not be decided whether the 2011 LSA is also protected by a First Amendment right of access.

at length in publicly available judicial opinions issued in those cases. *See, e.g.*, *VCA Cenvet, Inc. v. Chadwell Animal Hosp., LLC*, No. JKB-11-1763, 2012 WL 4005542 (D.Md. Sept. 10, 2012); *VCA Cenvet, Inc. v. Vill. Veterinary Ctrs., Inc.*, No. 11-cv-3119-WSD, 2012 WL 3779101 (N.D.Ga. Aug. 31, 2012); *Antech Diagnostics, Inc. v. Downers Grove Animal Hosp. & Bird Clinic, P.C.*, 2012 WL 2567045 (N.D.Ill. June 29, 2012); *Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*, No. 11-cv-448-SM, 2012 WL 1801742 (D.N.H. May 17, 2012).

In sum, because the parties fail to establish any interest that outweighs the public's common law right of access, each of the motions to seal will be denied, and the documents in question will be ordered unsealed.

**IV. Conclusion**

For the foregoing reasons, the motion to dismiss filed by Defendants Wendy Walker and Morwalk, Inc., will be denied, and the motions to seal filed by Defendants and by Plaintiff Antech Diagnostics, Inc., will also be denied. A separate Order will follow.

                                           /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge